Nading v. Elliott, Trustee, et al.

Filed April 4, 1894.

———◆———

No. 16,571,

NADING v. ELLIOTT, TRUSTEE, ET AL.

| 137 | 261 |
|-----|-----|
| 138 | 510 |
| 137 | 261 |
| 141 | 700 |
| 137 | 261 |
| 148 | 543 |
| 152 | 116 |
| 152 | 130 |
| 152 | 137 |
| 137 | 261 |
| 158 | 74 |

SUPREME COURT PRACTICE.—*Demurrer to Assignment of Errors.*—It is not necessary, on appeal, to demur to a defective assignment of errors in order to present the question of their sufficiency.

SAME.—*Special Finding of Facts.—Assignment of Errors.*—In order to present any question, on appeal, concerning the correctness of the conclusions of law upon a special finding of facts, there must be an assignment of error to the effect that the court erred in its conclusions of law; and an assignment that the judgment of the court is contrary to law presents no question concerning their correctness.

SAME.—*Exception to Conclusions of Law.—Practice.*—To present any question, on appeal, concerning the correctness of the conclusions of law, an exception must be taken to them by the party complaining.

SAME.—*Failure to Except to Conclusions of Law Can Not be Supplied.*—An assignment of error that the "finding" or "judgment of the court is contrary to law," can not take the place of an exception to the conclusions of law.

JUDGMENT.—*Special Findings.—Modifying Judgment.*—The judgment rendered on a special finding of facts must conform to the conclusions of law; and if it does not, a motion to modify such judgment so as to conform to such conclusions must be made in order to present any question, on appeal, concerning its correctness.

NEW TRIAL.—*Special Findings.*—If the special finding of facts is contrary to law, or not sustained by sufficient evidence, the remedy is by a motion for a new trial.

WILL.—*Construction.—Intent of Testator.*—In construing a will, the intention of the testator, if not inconsistent with some established rule of law, must control.

SAME.—*Trust Fund, Interest Payable to Life Tenant.—Remainderman.*—

*Interest Collected and in Hands of Trustee at Death of Life Tenant.*—
In a will, it was provided as follows: "I devise * * to my af-
fectionate wife, Amanda, during her life, the rents, profits and con-
trol of" certain described lands. "The said Amanda may sell and
convey said land * * * and be entitled to all interest arising
from the principal of such sale, subject to said trusteeship" provided
for the management of the estate. "I also bequeath to' my wife,
Amanda, the interest or use of four thousand dollars from my per-
sonal estate. To the interest of this four thousand dollars she shall
be entitled while she lives." "At the death of my wife, Amanda,
the principal and unpaid portion of interest of the whole amount
bequeathed to her * * shall descend and vest in my children or
their children." It was the duty of the trustee, as provided by the
will, to loan out this money and pay the interest to the widow.
*Held,* that her administrator or executor was not entitled to the in-
terest on these funds invested for her benefit which had been earned
and was in the hands of the trustee at her death; but, on the con-
trary, such interest was payable to the testator's children or their
descendants.
SAME.—*Annuities.*—*Apportionableness.*—*Death of Annuitant.*—If an an-
nuity is payable on fixed days during the life of the annuitant, and
he die before the day fixed, his personal representative is not en-
titled to a proportionable part of the annuity.

From the Shelby Circuit Court.

*A. C. Harris, E. P. Ferris, L. Cox, J. A. Tindall, W.
P. Fishback* and *W. P. Kappes,* for appellant.

*B. F. Love, H. C. Morrison, K. M. Hord* and *E. K.
Adams,* for appellees.

DAILEY, J.—This was a proceeding in the Shelby Cir-
cuit Court, upon the petition of John Elliott, as trustee
under the last will of Martin Warner, deceased. The
petition stated the amount of the funds in his hands as
such trustee, and the sources from which he derived
such funds, and made defendants thereto all parties
having or claiming any interest in any of such trust
funds, and prayed the court to render a decree constru-
ing the will and to adjudge and decree, as between the
defendants, to whom such trust funds belonged, and in
what proportions under the provisions of said will.

Upon issues joined by answers to the petition of said Elliott, and by cross-complaints filed in said cause and answers thereto, the court tried the cause and rendered its final judgment and decree therein by which it was adjudged and decreed that the defendant Israel Williams, as executor of the last will of Amanda Benham, deceased, owned no interest in said funds. It further adjudged and decreed that the appellant, Sonora V. Nading, is entitled to receive and have from the petitioner, Elliott, as trustee under said will, and his successors as such trustee, the interest from the one-third part of said fund of $13,540.90, and also from the one-third of the sum of $807.17, interest accrued on the first named sum, less one-third of the expenses of said trust; also that the petitioner, as such trustee, and his successors, shall, during the life of said Nading, loan out the said share of said money at customary rates of interest; and adjudged and decreed that such interest should be paid to her by the trustee until her death, and thereupon to her children then living as their absolute money and property. The $13,540.90, and the $807.17, interest accrued, constituted the whole amount of the trust funds in the petitioner's hands. As appears from the record, the living children of the appellant Sonora V. Nading, are Harry J., Walter R. and Martin M. Nading, who are all minors, and William Nading is their guardian; they and their guardian are made defendants in said petition. It is also shown that appellant, Sonora, had another child that died on the 17th day of November, 1891, being before the commencement of this suit, and said William Nading was duly appointed administrator of her estate, and he in his trust capacity is made a defendant in this proceeding. By the cross-complaint of the said Sonora V. Nading, in the lower court, against her living children and their guardian, and against said

William Nading as administrator of the estate of her deceased child, and also against said Elliott as trustee, and by the answer of her said children and their guardian, and of said administrator thereto, an issue was formed between her and her children and the administrator aforesaid as to the ownership of this money. From the judgment of the court below upon this question, the appellant, Sonora V. Nading, brings her appeal to this court. There was a trial upon this issue in the lower court, and at the request of the parties special findings and conclusions of law made thereon. The whole of the argument contained in appellant's brief is predicated upon supposed errors of the trial court in its conclusions of law drawn from the facts found; but it seems there is no assignment of error that in any manner brings in review before this court the correctness of such conclusions of law. Of course it is not necessary to demur to an assignment of error. Elliott's App. Proc., sections 401–402, and authorities there cited. It is said in section 401: "Defects in the assignments of errors when called to the attention of the court in the brief or argument will receive consideration, and the parties by this course can secure all the substantial benefit that a demurrer could procure." In section 402 it is said: "As errors not well assigned are disregarded there can be no possible reason for demurring. There are, on the other hand, substantial reasons why the practice of demurring should be disapproved." Sonora V. Nading's assignments of error are as follows:

1. The court erred in sustaining the motion of William Nading, guardian of Harry J. Nading and Walter Nading, minor heirs of John Nading, deceased, and as administrator of the estate of Mary G. Nading, deceased, to strike out the second paragraph of the reply of Sonora V. Nading to the answer of the said William Nading, as

guardian and administrator, to the cross-complaint of Sonora V. Nading.

2. That the finding of the court is contrary to law.

3. That the court erred in overruling the motion of appellant, Sonora V. Nading, for a new trial.

4. That the judgment of the court is contrary to law.

It is a well settled rule that where there is a special finding of facts and conclusions of law stated thereon, to present any question as to the correctness of the conclusions, there must be an assignment of error upon the record of this court, that the court erred in its conclusions of law. Buskirk's Pr., p. 205; 1 Works' Prac. & Pl., section 809; *Lewis* v. *Haas*, 50 Ind. 246; *State, ex rel.*, v. *Berg*, 50 Ind. 496; *Selking* v. *Jones, Admr.*, 52 Ind. 409; *Hartman* v. *Aveline*, 63 Ind. 344; Elliott's App. Proced., 794.

In the case of *State, ex rel.*, v. *Berg, supra,* the court said: "The plaintiff excepted to the conclusion of law, but there is no assignment of error upon the conclusions; hence, the correctness of the conclusions is not properly questioned here." Citing *Montmorency, etc., Co.* v. *Rock*, 41 Ind. 263; *Cruzan* v. *Smith*, 41 Ind. 288.

In *Curry* v. *Miller*, 42 Ind. 320 (323), this court said: "There was no exception taken to the conclusions of law drawn by the court from the facts found. This was necessary in order to present any question arising upon such conclusion."

In this, the court further said: "The record informs us that the appellant 'moved in arrest of judgment upon the finding,' but that the motion was overruled, and he excepted. This ruling is not assigned for error, even if it could be made to take the place of an exception to the conclusions of law from the facts found. Exception was taken to the rendering of judgment against the appellant. But judgment followed inevitably unless the court was

wrong in its finding of the facts or in its conclusions of law upon those facts.   The evidence not being in the record, and there being no assignment of error upon the over-ruling of the motion for a new trial, we can not say that the evidence did not sustain the court's finding of the facts; and there being no exception to the conclusions of law from the facts, if the court erred in its conclusions, the error is not so presented here as to enable us to reach it.''

In view of this opinion, it is clear that the fourth specification of error, ''that the judgment of the court is contrary to law,'' can in no event amount to an excep-tion to the conclusions of law stated by the court upon the facts found, as the correctness of such conclusions can only be challenged in this court by assigning as error herein that the lower court erred in its conclusions of law.

As the evidence is not in the record in the case at bar, the accuracy of the facts found by the trial court could in no manner be assailed, or brought into review before this court by any assignment of error that could be made upon the record.   If the evidence were before us, that question might have been available under the third as-signment of error.

In *Robbins* v. *Magee*, 96 Ind. 174, 175, the court said: ''The plaintiffs again appealed to this court, and have assigned eight specifications of error.   The first three are that the finding is contrary to law, not sustained by sufficient evidence, and is contrary to the law and the evidence.   These are not proper specifications of error. The only way to make these questions available in this court is to embrace them as reasons in a motion for a new trial, and assign error upon the overruling of the motion.   If there was any such motion made in this case, there has been no error assigned upon the over-

ruling of it. Hence these questions are not before us in any way to be considered.''

It thus appears, from this quotation, that the second and fourth errors assigned by the appellant, Nading, are not proper specifications to bring the correctness of the conclusions of law in review before this court.

This doctrine finds support in *Midland R. W. Co.* v. *Dickason*, 130 Ind. 164 (165), where it is said: ''The cause was tried by the court, without the intervention of a jury, and at the request of the parties the court made a special finding of the facts and conclusions of law, upon which, subsequently, a judgment was rendered against the appellants. The errors assigned in this court are as follows: '1st. The court erred in rendering judgment on the special finding. 2d. The court erred in rendering a personal judgment against the railroad company without relief from valuation laws. 3d. The court erred in * * enforcing a lien and priority on the road in Montgomery county. 4th. The court erred in rendering a personal judgment for attorney's fees, * *.' In order to present for review in this court the correctness of the conclusions of law, deduced by the court from the facts found, two things are necessary: 1st. An exception to the conclusions of law must be taken * *. 2d. It must be assigned as error in this court that the court below erred in its conclusions of law.'' ''This exception was not, as it should have been, taken at the time the court returned its conclusions of law; nor was the exception, when taken, to such conclusions of law, but to the rendition of a judgment in favor of the plaintiff. The appellants having waived, by failing to except, all objections to the conclusions of law, it was not error for the court to render judgment for the plaintiffs in accordance with such finding and conclusions.''

In the case many authorities are cited to this effect.

This court, in *Smith* v. *McKean, Admr.*, 99 Ind. 101 (107), said: "This judgment was in accordance with the conclusions of law stated. The motions of the appellant to modify the judgment sought only such changes therein as would have made it not in accordance with said conclusions of law. Such a mode of proceeding is unknown in our practice. The R. S. 1881, section 551, requires that in a special finding the court shall first state the facts in writing, and then the conclusions of law upon them, 'and judgment shall be rendered accordingly.'

"This mode of stating the finding of the court is provided for the express purpose of enabling a party to except to the decision of the court upon the questions of law involved in the trial. If a judgment rendered on a special finding should not conform to the conclusions stated, a motion would lie to so modify the judgment as to make it conform to such conclusions; but where the judgment rendered on a special finding is in accordance with the conclusions of law stated, error in such conclusions, rendering erroneous the judgment 'entered accordingly,' can not be reached by a motion to modify the judgment."

By the sixth subdivision of section 559, R. S. 1881, enacting causes for new trial it is provided as cause therefor: "That the verdict or decision is not sustained by sufficient evidence, or is contrary to law."

In Works' Pr. & Pl., vol. 1, section 916, pages 596 and 597, the author, in discussing the sixth clause of that section, says: "Where there is a special finding of facts by the court that is contrary to law, or not sustained by sufficient evidence, the remedy is by motion for a new trial." Citing *Marsh* v. *Terrell*, 63 Ind. 363.

In the same section it is also said: "If there was proof pertinent to any issue on which the court ought to have found facts which were not found, the remedy would

be by a motion for a new trial, on the ground that the finding is contrary to law." Citing *ex parte Walls,* 73 Ind. 95 (110 and 111); *Jones* v. *Baird,* 76 Ind. 164.

The first and third specifications of error in no manner attempt to call in question or raise in this court the correctness of the conclusions of law stated from the facts specially found. As the specifications make no legal attack upon the conclusions of law, but only seek to assail the judgment that the court rendered thereon, they are ineffectual to bring into review such conclusions, and can have no force or efficacy in the decision of this cause.

In the construction of the testator's will the court below held that under its provisions the estate of his second and childless wife Amanda, she having died, is not entitled to receive any part of the funds in said trustee's hands. From the decree so entered, Israel Williams, her executor, prosecutes an appeal. He assails the decision on two grounds: 1st. That the court erred in not awarding his testator's estate the interest in the hands of the trustee at the time of her death, which accrued on the trust funds in his hands, aside from that belonging to Mrs. Porter and her children, being $580.32. 2d. That the court erred in not awarding to said estate the ownership of $3,060.90, of said trust fund in the hands of said trustee, being the one-fifth of $15,304.50, left for distribution after all the special legacies had been paid.

It appears that Martin Warner duly executed his last will and testament in May, 1872, and died in August, 1872. His heirs and descendants, who were all beneficiaries in the will, were as follows: Amanda Warner, his widow; Esta Higgins, his daughter, who was the mother of five children; Sarah Porter, his daughter, who was the mother of seven children; Sonora V. Nading, his daughter, who was then married but childless, and afterwards became the mother of four children, three of

whom are now living; Walter Walker, a grandson, by a deceased daughter of the testator.

By the terms of his will, Martin Warner, after the usual provisions for interment and payment of debts, makes devises and bequests to his three daughters, Esta, Sarah, and Sonora, providing for succession to their children. He declares his purpose to place his three daughters upon an equality, the land for Sonora being worth $12,000, and the other two daughters having money bequests sufficient, with their lands, to make up in value, $12,000 each.

As to the real estate devised, the rents and profits were to go to each daughter during her life, with remainder to her children. As to the money bequests, the two daughters, Esta and Sarah, were to receive only the interest during their lives, and in order to preserve the principal, provision was made for a trustee as follows: "The court shall appoint some suitable man as trustee, who shall hold said money and shall loan it out at customary interest and pay the interest to and for the special benefit and maintenance of said Esta Higgins, and especially also for the maintenance and education of her children. "In order to make Sarah Porter equal with Esta Higgins, I bequeath to her, the said Sarah Porter, the sum of two thousand dollars, which shall be placed in the hands of said trustee, who shall be governed in the management of the same and the disposition thereof, as the money bequeathed to my daughter, Esta Higgins." To his grandson, Walter Walker, he devised eighty acres of land and $1,000 in cash upon certain conditions as to marriage. The will further stipulates:

"Twelfth. If my children should all be dead, the property herein devised and bequeathed shall go to my grandchildren in equal proportions, so that each separate set or class of children shall be entitled collectively

Nading *v.* Elliott, Trustee, *et al.*

to the amount their mothers would have been entitled to, had they survived.

"Thirteenth. I also devise and bequeath to my affectionate wife, Amanda Warner, during her life, the rents, profits and control of all that portion of land of which I am the owner at this time, it being a part of the north half of the northwest quarter of section thirty-five in township No. eleven north, of range six E., in Shelby county and State of Indiana, containing about seventy-six acres, be the same more or less. 'This bequest shall also include all the lots of which I am the owner at this time in the town of Flat Rock, in said county, being formerly a part and parcel of said tract of land. This land and lots are estimated to be worth eight thousand dollars. Should I, by the consent of my wife, Amanda Warner, sell this tract of land and lots while I live, the said Amanda Warner shall be entitled to the interest of the money arising from said sale. The said Amanda Warner may sell and convey said land and lots after my death, by proper deeds of conveyance, and without any order from court, and be entitled to all the interest arising from the principal of such sale subject to said trusteeship.'

"Fourteenth. After the death of myself and wife this land and lots shall be sold, if unsold at that time, and the money arising from said sale shall descend to my three children now living, or their children, and to be governed by the same rules as and provided for herein as to the devises and bequests made to them elsewhere in this will. 'I also bequeath to my wife, Amanda Warner, two thousand dollars, being money she inherited from her father's estate, which has become consolidated with my property. 'This amount of two thousand dollars is bequeathed to my wife, Amanda Warner, without any

restriction whatever.   She has the right to bequeath or give the same to whom she may wish or desire.'

"Fifteenth.  I also bequeath to my wife, Amanda Warner, the interest or use of four thousand dollars from my personal estate.   To the interest of this four thousand dollars, she shall be entitled while she lives, which shall be placed in the hands of a trustee and be under the same rule and restriction as the money bequeathed to my children.   'At the death of my wife, Amanda Warner, the principal and unpaid portion of interest of the whole amount bequeathed to her in this will, except the two thousand dollars heretofore named, shall descend and vest in my children, or their children, and in the hands of said trustee shall be under the same rules, restrictions and conditions as the money herein bequeathed to them.'

"Eighteenth.  I also direct that when all the bequests of this will are filled, that if there is any money or property of any kind left, or any of the bequests fall back, the same shall be turned into money, and shall be equally divided between my wife, Amanda Warner, and my three children, and my grandson, Walter Walker, making five shares.   'If either of the five be dead, then to the survivors, and their children, if any are living, as provided for them elsewhere in this will.   These shares, whatever they may be, are subject, in the hands of the trustee, to the same rules as the money bequeathed to them elsewhere in this will.'

"Nineteenth.  I constitute and appoint my brother, George Warner, and my wife, Amanda Warner, the executors of this, my last will and testament."

A trustee was appointed by the court, according to the conditions of the will, and Martin Warner's estate was thereupon settled.

After all the special legacies had been paid, there remained, from the assets of the estate, for distribution under clause 18 of the will, the sum of $15,304.50. One-fifth of this sum was taken by the trustee on behalf of the widow, Amanda, viz. $3,060.90. The trustee also took to the credit of the widow, under clause 15 of the will, $4,000. Afterwards the widow sold the land described in clause 13 of the will, and the sum realized therefrom was also taken by the trustee to her credit, $6,480, making the total so taken by the trustee for the widow, $13,540.90. This sum, together with the funds held by the trustee for the two daughters, Esta and Sarah, was loaned out at customary interest. The interest earned by the fund for Amanda was from time to time collected and paid over to her.

The widow died on November 27, 1891, and, at the time of her death, there remained certain interest which had accrued, but had not been collected by the trustee or paid over to her. It is shown by the record that the total interest so accrued up to November 27, 1891, upon the funds of the said widow and Sarah Porter, amounted to $797.66, "which interest belongs to the separate funds in proportion to their respective principals." The proportion of interest accrued on the widow's fund of $13,-540.90, up to the date of her death, was, therefore, $580.32. Since the date of her death, interest has accrued on the fund, and remains in the hands of the trustee.

The foregoing facts, in substance, were set out in the trustee's petition.

The parties all entered appearance and filed pleadings, in which the facts stated in the petition are expressly admitted.

Issues were formally made up by general denials filed

by each to the others' answers and cross-complaints, and the cause was submitted to the court.

There is no controversy about the facts. They were admitted upon the trial, and, in the special findings, the court states the facts as they are alleged in the petition.

Upon these findings of fact, the court below concluded, as heretofore stated, that appellant, Williams, the executor of the widow's estate, was not entitled to any part.

It is insisted, by the learned counsel for the widow's executor, that upon the claim for interest, she had a vested right to the interest as it accrued on the fund, and that her right to what accrued up to the date of her death, whether collected by the trustee or outstanding, passed to her executor.

Many ingenious and plausible reasons are suggested and arguments indulged in by counsel in support of this contention.

On her claim for interest it is urged that what the fund earned would be hers for her maintenance and support; that it would be so certain and reliable in its character that she might incur debts upon the faith of the income as fast as it was earned; that when the beneficiary dies between the interest payments, it is apportioned between the remainderman and the executor of the life tenant in the ratio of their respective periods; that it is not supposed the testator intended to put into the power of the trustee the control of the descent in any wise, his only function being to see that the investment is made and to pay the interest to the proper person; that upon the view taken by the lower court, the trustee might, by mere inactivity and neglect of duty, or even by collusion with the remaindermen, contrive to have in his hands, at the widow's death, a large sum that he should have paid her before; or he might corruptly loan the fund

out, making the interest payable only every five years; that in many ways he could prevent the widow enjoying the income, or else defeat creditors who might advance to her on the faith of the income earned; that in cases the literal force of the language of the will has been moulded into conformity with the intention of the testator; that the words employed in item 15 are not intended to curtail the effect of the gift; that the testator did not use the word "unpaid" in this item in a literal sense; that it would be ambiguous as it stands, and the clause means interest to the date of her death; if not counsel say the word "portion" is meaningless.

We are then asked to construe the word "unpaid" as being the equivalent of the word "unaccrued" so as to effect the intention of the testator, and are reminded that the court should not attach to an ambiguous expression used in a clause aimed at a different object, a meaning that will defeat the life estate; that the will says she was entitled to "all the interest arising from the principal of such sale," and that the testator must have known that by the statute of Indiana, rents are apportioned between the life tenant and the remainderman.

With reference to the claim for the $3,060.90, with accrued interest, it is insisted that the widow's share became vested in her absolutely, as soon as it was determined what that share was, and the division was made, and that at her death it passed to her executor.

In support of this, counsel say: "It is a gift of personal property, and then there are no words limiting the enjoyment to be for life only, hence it becomes absolute; that he distributes the amount wholly and positively."

This recital contains the material points on which the appellant, William, relies for the reversal of the case at bar. In this branch of the case, no question arises as between the descendants of the testator as to what relative

shares or interest they are to have in this trust fund, as against each other. Here we have the estate of the widow against all other legatees. In our opinion, a careful analysis of the provisions of the will makes it clear that Amanda's estate has no interest in the moneys in the hands of the trustee.

In Beach on the Law of Wills, p. 517, section 313, it is said: "All the parts of a will are to be construed in relation to each other, and in such manner as to form, if possible, one harmonious whole."

In *Jackson* v. *Hoover*, 26 Ind. 511 (517 and 518), it is declared to be a fundamental rule in the construction of wills that the intention of the testator, if not inconsistent with some established rule of law, must control. In order to determine such intention "all the parts of a will are to be construed in relation to each other, and so as, if possible, to form one consistent whole."

"Courts will look at the circumstances under which the devisor makes his will, as to the state of his property, of his family and the like."

"Where the intention is obscured by conflicting expressions, it is to be sought rather in a rational and consistent than in an irrational and inconsistent purpose."

"That words of a will may be transposed, supplied or rejected, where warranted by the immediate context or the general scheme of the will, but not merely on a conjectural hypothesis of the *testator's* intention, however reasonable, in opposition to the plain and obvious sense of the language of the instrument."

Looking to the entire will in all its provisions, it seems evident that the testator intended to dispose of his entire estate upon a plan which placed his three daughters on an exact equality, giving each, during their respective life, for their support, and the maintenance and education of their children, in devises and bequests, the

income from certain property and money, and at the
death of each daughter such lands and money are to go
to the children of the one so dying.   To effectuate this
purpose, he places the bequests in the hands of a trustee,
"who shall hold said money, and shall loan it out at in-
terest, and pay the interest to and for the special benefit
and maintenance of" such daughters, and "especially,
also, for the maintenance and education of" their chil-
dren, and, at the death of either of the daughters, the
principal and such interest as may be unpaid shall de-
scend to her children.

It is further evident, from a construction of its pro-
visions, that as a part of the general scheme of the tes-
tator for the disposition of his estate, he devised and
limited to his wife, during her natural life, the rents,
profits and control of certain specified lands and lots, or,
in the event of their sale, as provided by the terms of
the will, the interest arising from the principal thereof,
which should be paid prior to her death; also the inter-
est of $4,000, and the interest on the residuary fund of
$3,060.90, during a like period of time, and, by its con-
ditions, at her death, the entire amount of the principal
and unpaid interest descended to and vested in his chil-
dren during their lives, with remainder to their children,
as is stipulated in other clauses of the will, subject to the
provisions of said trusteeship.

The operative words of the will carrying the interest
or income from the fund for Amanda, occur in item 13,
where it is provided:   "I devise   *   *   *   to my af-
fectionate wife, Amanda, during her life, the rents, prof-
its and control of" (certain lands described).   "The
said Amanda may sell and convey said land   *   *   *
and be entitled to *all the interest arising from the prin-*
*pal* of such sale, subject to said trusteeship."   And, in
item 15:   "I also bequeath to my wife, Amanda War-

ner, *the interest or use* of $4,000 from my personal estate. To the interest of this $4,000 she shall be entitled while she lives.''

The words above set out would have entitled the widow's estate to the interest accrued up to the date of her death, but further language occurring in item 15 of the will: ''At the death of my wife, Amanda Warner, the principal *and unpaid portion of interest of the whole amount bequeathed* to her * * shall descend and vest in my children or their children, and in the hands of said trustee shall be under the same rules, restrictions, and conditions as the money herein bequeathed to them,'' curtails the effect of the gift.

We think the testator, in the use of the word ''unpaid,'' used an apt and appropriate word to express his real intention, and that it was employed by him in its literal sense.   Its purpose was to describe with exactness just what property should pass, and the quantity of the preceding life estate, as well as to mark out the line of succession, and his intention was not confined alone to the subsequent descent.   Counsel say he did not aim at exactness, but meant only what was left after he had given to Amanda for life, and if the word ''unpaid'' is taken in a literal sense it would, under the circumstances, be ambiguous:

''Unpaid—By the borrower to the trustee.''

''Unpaid—By the trustee to the widow.''

''Unpaid—By the widow for her support.''

We can not surmise what the testator did mean as against the clear, concise and unambiguous language of the will itself.   It is apparent that the word ''unpaid,'' as used in its connection in this clause, can not signify ''unpaid—by the widow for her support.''

The principal was, by the testator's will, in the hands and under the control of the trustee, to be by him loaned

out at interest. He alone was empowered to collect the interest and pay it to her. It thus became, when she received it, her absolute property, with full power to dispose of it at her pleasure, and it would, in no sense, belong to the estate of the testator. This word, as used in the clause, does include and comprehend all interest on the principal that has not been paid to Amanda, whether the trustee has collected that interest from the borrower or not.

To substitute the word "unaccrued" for "unpaid" is equally absurd. There is a marked difference between a debt unpaid and a debt unmade. If the testator intended by his will that all the interest accrued upon this money, up to the instant of her death, should belong to her and her estate, and should be paid to her or her executor, then at her death there could be no portion of unpaid interest remaining to descend to and vest in the testator's children or their children. So, when the testator speaks of the unpaid portion of the interest at her death, this language unmistakably presupposes that there may be at the time of her death, an existing claim or demand for interest on the loans that has then accrued.

In our opinion the appellant is not strengthened in his claim to the unpaid interest by the assertion that when making his will he must have known that by the provisions of section 5223, R. S. 1881, the rents due to a life tenant are apportionable, in case of his death during rent days. The will was executed on May 14, 1872, and the statute was not enacted until in 1881. The testator was possessed of no such prophetic power. At the date of the execution of the will it was the doctrine of the courts that annuities were not apportionable.

In *Heizer* v. *Heizer, Admx.*, 71 Ind. 526 (529), the court quotes with approval from *Wiggin* v. *Sweet*, 6 Met. (Mass.) 194, in which it is said: "The general rule,

both of law and equity, is, and is admitted by the appellee's counsel to be, that where an annuity is payable on fixed days during life, and the annuitant dies before the day, the personal representative is not entitled to a proportionable part of the annuity.''

There is no danger to be apprehended from this construction that the trustee might, by mere inactivity, neglect of duty, or collusion with the remaindermen, prevent the widow from enjoying her income, or defeat the rights of creditors.  The trustee is bound by law to exercise care and diligence in loaning out his trust fund, collecting the interest and paying it to the widow and to the use of reasonable care and skill in that behalf, and if, by any careless, corrupt, or willful neglect of duty, or partiality in favor of another, she suffer any loss or injury, equity will afford her relief by an action upon his official bond for the damages she has sustained, and she may have him removed from his trust.

It is the duty of the trustee, in all such cases, to consult the interests of both the life tenant and remainderman.   Perry on Trusts, section 530.

With reference to the appellant's claim for $3,060.90, with accrued interest, it is urged that Amanda's share became vested in her absolutely, as soon as it was determined what that share was and the division was made, and that at her death it passed to her executor.   To uphold this assumption counsel say:   ''It is a gift of personal property, and there are no words limiting the enjoyment to be for life only, hence it becomes absolute''; that the will ''distributes the amount wholly and positively.''

In this counsel are mistaken.   The testator limits the title to her for life in these words:   ''These shares, whatever they may be, are subject in the hands of the trustee

to the same rules as the money bequeathed to them elsewhere in this will.''

This does not refer to the rule of management of the fund but to a rule of descent.'' It requires, as does item 8 relating to Sarah Porter, that the trustee ''shall be governed in the management of the same and the disposition thereof as the money'' for Esta Higgins, and saves the principal and unpaid interest for ultimate distribution among his grandchildren. This idea is emphasized in every provision made for the widow. As is shown item 13, in the event of a sale of the land, entitled her ''to the interest of the money arising from said sale'' * * * ''subject to said trusteeship.'' Item 14 sends this money to his living children, or their grandchildren, ''to be governed by the same rules'' * * ''as provided for as to the devises and bequests made to them elsewhere in this will.'' Item 18, which we here transpose, as before stated, subjects the residuary bequests to the same rules as the money elsewhere bequeathed to them in this will. Item 14 gives to the widow $2,000 absolutely in discharge of a pre-existing debt. Item 15 casts the whole amount of the principal and unpaid interest, except the $2,000 heretofore named, at her death, upon his children or their children under the same rules, restrictions and conditions as the money herein bequeathed to them, thereby excluding the idea that Amanda was given a vested right either in the unpaid interest or the residuary estate. Thus construed, all difficulties and apparent inconsistencies are obviated, and the provisions of the will are rendered harmonious. We think the court below did not err in its conclusions of law.

The judgment is affirmed.

HACKNEY, J., took no part in this opinion.

Filed March 6, 1894.

Doherty *et al. v.* Holliday *et al.*

No. 15,390.

DOHERTY ET AL. *v.* HOLLIDAY ET AL.

PLEADING.—*Joint Parties.—Cause of Action as to Only One Party.*—If a complaint assumes to state a cause of action in favor of two or more parties, and states a cause of action in favor of part only of the parties thus joined, it is bad on demurrer.

SAME.—*Joint Parties.—Creditor's Bill.*—If the parties are designated as plaintiffs in a complaint in the nature of a creditor's bill, and there is a statement of the respective claims of creditors showing that each claim is several and distinct, and there is no attempt to state a joint cause of action in favor of those who are named in the title, the general rule requiring a joint cause of action to be stated in favor of all the parties does not apply.

SAME.—*Code.—Equitable Relief.*—The code has not swept away former equitable rights, nor abrogated remedies that are essentially equitable; and the fact that it has provided for one form of action does not imply that equitable rights and remedies have ceased to exist.

PARTIES.—*Fraudulent Conveyance.—Creditor's Bill.*—In an action in the nature of a creditor's bill, brought to subject property fraudulently conveyed to a satisfaction of a creditor's claim, all creditors who make seasonable and appropriate application will be admitted as parties.

SAME.—*Fraudulent Assignee.*—A fraudulent assignee of property is a proper party in an action to subject such property to execution or the payment of the assignor's debts.

FRAUDULENT CONVEYANCE.—*Distribution of Assets.*—Where property has been fraudulently conveyed to avoid the payment of debts, all creditors of the fraudulent debtor will be permitted to share, upon due application, in the proceeds of the property so conveyed.

SAME.—*Grantee, When Liable.*—A person who takes a conveyance of property with the intention of aiding the grantor in defrauding his creditors is liable to such creditors to the extent of the property he receives, even though he subsequently disposes of the property, such a vendee is a trustee for the creditors.

PRACTICE.—*General Finding at One Term, Specific at Another.*—In an action brought by creditors to subject property to the satisfaction of their claims, the court may make a general finding at one term of the court to the effect that the transaction was fraudulent and the conveyance should be set aside; and at another term make the necessary specific findings and appropriate decretal orders respecting the amount and claims of each separate creditor.

Doherty *et al. v.* Holliday *et al.*

JURISDICTION.—*Equity Assumes for all Purposes.*—If a court of chancery assume jurisdiction of a case for one purpose it will retain jurisdiction for all purposes; and if a specific decree will not afford adequate relief, it will award compensation.

Opinion on petition for rehearing by DAILEY, J.

From the Montgomery Circuit Court.

*G. D. Hurley, M. E. Clodfelter, B. Crane* and *A. B. Anderson,* for appellants.

*G. W. Paul, M. W. Bruner, E. Woollen* and *W. W. Woollen,* for appellees.

ELLIOTT, J.—The complaint sets forth several and distinct claims in favor of the plaintiffs respectively, as creditors of the firm of Fisher Doherty & Son.

After alleging that the firm is indebted to the plaintiffs severally, and stating the amount and character of the claims distributively, the complaint charges that a conspiracy was entered into between Fisher Doherty and Marshall D. Doherty, who composed the firm of Doherty & Son, with other of the defendants, to defraud existing and subsequent creditors.

It is also alleged, with particularity, that pursuant to the conspiracy the firm of Doherty & Son fraudulently executed an assignment, that they also executed other conveyances and that they suffered judgments to be taken against them for the purpose of carrying into effect the fraudulent design of the conspirators.

The complaint prays judgment for "the amount of the several claims" of the plaintiffs, and that the conveyances be set aside as fraudulent.

In the title of the pleading, three persons are named, with many others, as plaintiffs, but in the body of the complaint no attempt is made to show that the three persons referred to are creditors of the defendants.

The appellants' counsel contend that the complaint is

bad because it does not show a cause of action in all who join as plaintiffs.

The general rule is this: If a complaint assumes to state a cause of action in favor of two or more parties, and states a cause of action in favor of part only of the parties thus joined, it is bad on demurrer. *Nave* v. *Hadley*, 74 Ind. 155; *Peters* v. *Guthrie*, 119 Ind. 44. See authorities cited Elliott's App. Proced., section 664.

We are not willing, however, to hold that the general rule applies to this case, for it is one of a peculiar character. Our judgment is that where parties are designated as plaintiffs in the title of a complaint in the nature of a creditors' bill, and there is a statement of the respective claims of creditors showing that each claim is several and distinct, and there is no attempt to state a joint cause of action in favor of those who are named in the title, the general rule does not apply. In order to determine whether the general rule governs, it is necessary to consider the general nature of the suit, and the principles by which suits of its class are controlled. The code does not sweep away former equitable rights, nor does it abrogate remedies that are essentially equitable; on the contrary, as our decisions prove, the court fully recognizes such rights and remedies. It is true that the code provides for one form of action, but this by no means implies that equitable rights and remedies have ceased to exist. In cases where the complaint states such facts as entitle the complainant to equitable relief, the court will look for guidance to the equity principles and doctrines.

The complaint in this case is in the nature of a creditors' bill, and looking to the equity doctrine applicable to such a case, we find that the rule is that the courts let in all creditors who make seasonable and appropriate application. *Pendleton* v. *Perkins*, 49 Mo. 565; *Johnson*

v. *Waters*, 111 U. S. 640; *Hartshorn* v. *Eames*, 91 Me. 93.

Our own court has given its sanction to the general doctrine. *Field* v. *Holzman*, 93 Ind. 205; *Phelps* v. *Smith*, 116 Ind. 387; *Towns* v. *Smith*, 115 Ind. 480.

The principle embodied in the maxim that "Equality is equity," has been enforced by our decisions. They have given it practical effect by holding that creditors should all be permitted to participate, upon due application, in the proceeds of property fraudulently conveyed. *Voorhees* v. *Carpenter*, 127 Ind. 300; *Vestal* v. *Allen*, 94 Ind. 268, and cases cited; *Barton* v. *Bryant*, 2 Ind. 189.

As it is the chief purpose of a complaint in the nature of a creditors' bill to secure property for the benefit of creditors and make an equal distribution of it, all creditors may unite, and in such a case the complaint ought not to be held bad because it fails to state the claims of three out of many persons, simply because the three are designated as plaintiffs in the title of the pleading. It would be carrying the general rule to an unreasonable length to apply it here, since that would give an undue importance to the formal part of the complaint denominated the title. *Mississinewa Mining Co.* v. *Patton*, 129 Ind. 472.

If the complaint had professed to state a joint cause of action, instead of stating independent claims, there might possibly be plausibility in the contention that as there was no right of action shown in all whose names appeared in the title of the complaint it should be held bad upon the ground that it does not state facts sufficient to constitute a cause of action.

The complaint charges that the assignment was fraudulent, and alleges that the assignee was a participant in the fraud, so that the rule that where there is an as-

signee under the voluntary assignment act he must sue to set aside fraudulent conveyances made by the debtor, does not apply. The rule that the assignee is ordinarily the person who must sue, we fully approve, as the court has done before. *Voorhees* v. *Carpenter, supra*, and cases cited.

But we deny that the rule has any application to such a case as this.

One who colludes with a debtor to defraud creditors, is a proper party to a suit to set aside conveyances made in furtherance of the fraudulent design of the debtor.

A grantee of property conveyed by a debtor to defraud creditors is liable for the value of the property conveyed to him if he actively participates in the fraud, and subsequently disposes of the property. The doctrine that a fraudulent grantee must account for property which his wrongful act assisted in taking from the reach of creditors, rests on solid principle and has strong support from the adjudged cases. *Blair* v. *Smith*, 114 Ind. 114; *Post* v. *Stiger*, 29 N. J. Eq. 554; *Murtha* v. *Curley*, 90 N. Y. 372; *Ferguson* v. *Hillman*, 55 Wis. 181; *Williamson* v. *Williams*, 11 Lea, 355; *Smith* v. *Sands*, 17 Neb. 498; *Fullerton* v. *Viall*, 49 How. Pr. 294.

What we have said disposes of the objections urged against the complaint and requires the conclusion that there was no error in holding it good.

The court assessed damages in favor of the parties whose names appeared in the title of the complaint, but whose claims were not set forth. In this there was no error. If those parties were creditors they had a right to come in and have their claims allowed before final distribution of the avails of the property fraudulently conveyed. Where a court possessing equity powers acquires jurisdiction of property held by fraudulent grantees or assignees, it will decree sale and distribution of proceeds

and will protect creditors, even though they were not original plaintiffs.

In the absence of a countervailing showing, the presumption is that the trial court proceeded regularly and rightfully. See authorities cited in Elliott's App. Proced., sections 709, 712.

As the court had authority to let in all creditors at any time while the proceedings were pending and open, and as there is nothing in the record showing that this authority was not properly exercised, it is our plain duty to give the presumption effect and sustain the rulings of the trial court.

Objections not made in the court below are, as a general rule, not available on appeal. If there was, as is now claimed, no issue under which the evidence of the claims of some of the creditors was admissible, the objection should have been made in the trial court. *Townsend* v. *State*, 132 Ind. 315; *Graves* v. *State*, 121 Ind. 357, and cases cited. See, also, authorities cited Elliott's App. Proced., sections 293, 476, 631.

During the September term the trial court made and entered a finding against the defendants therein named, and in favor of the plaintiffs. At the subsequent term, damages in favor of the plaintiffs respectively were assessed and the proper decree rendered. There was no error in this. A court of equity, in such a suit as this, may at one term enter a general finding of the character here made, and afterwards make the necessary specific findings and the appropriate decretal orders. It is manifest that a finding, such as that here first announced, does not end the controversy, since proof of claims and of other matters may be made at any time before the final decree terminating the suit.

Such cases as *Wray* v. *Hill*, 85 Ind. 546, are not in point here.

The liability of a fraudulent grantee who accepts a conveyance of property for the corrupt purpose of enabling the grantor to keep it from his creditors is not remote or contingent, although it is not strictly a legal liability. It is a direct liability, as clear and strong as any legal liability can be, created by courts of equity and rested upon broad principles of natural justice. The instant such a wrong-doing grantee accepts the conveyance he becomes a trustee for creditors, and he violates his duty as trustee if he makes way with the trust property. *Blair* v. *Smith, supra; Chamberlin* v. *Jones,* 114 Ind. 458.

If he sells it, equity will follow the proceeds of the sale into his hands, or, if justice requires, charge him with the value of the property. Whether he holds as trustee or violates the trust by disposing of the property, equity will hold him liable, and make such a decree as will protect or enforce the rights of creditors. *Reeg* v. *Burnham,* 55 Mich. 39; *Farlin* v. *Sook,* 30 Kan. 401; *Mason* v. *Pierron,* 69 Wis. 585; *Christian* v. *Greenwood,* 23 Ark. 258; S. C. 79 Am. Dec. 104.

The appellant's counsel, as is evident from what we have said, are in error in assuming that equity will not make a fraudulent grantee account for the value of property sold by him after its conveyance to him by the fraudulent grantor. It is, we may add, a familiar principle of equity jurisprudence, that where a court of chancery assumes jurisdiction of a case for one purpose it will retain jurisdiction for all purposes, and if a specific decree will not afford adequate relief it will award compensation.

The evidence fully supports the finding of the trial court, and the record shows that the merits are entirely with the appellees.

Judgment affirmed.

Filed Nov. 3, 1892.

## PETITION FOR A REHEARING.

DAILEY, J.—An able and earnest petition has been filed by the appellant Mattison O. Doherty in this cause, in which it is insisted that "this suit can only be maintained by the assignee, Alexander F. Ramsey." This attacks the complaint upon the ground that there is a defect of parties plaintiff. It is charged in the complaint that there was a conspiracy formed by Fisher Doherty, Marshall D. Doherty and the firm of Fisher, Doherty & Son, composed of said Fisher Doherty and Marshall D. Doherty, with Mattison O. Doherty and the said Alexander F. Ramsey to defraud the creditors of said Fisher Doherty & Son, and that the assignment was made in furtherance of the scheme of the conspirators. In regard to this matter ELLIOTT, J., in the opinion of this court, said: "The complaint charges that the assignment was fraudulent, and alleges that the assignee was a participant in the fraud, so that the rule that, where there is an assignee under the voluntary assignment act, he must sue to set aside fraudulent conveyances made by the debtor, does not apply." In their brief counsel for the appellants say: It clearly appears from the allegations of the complaint, that Alexander F. Ramsey was duly appointed assignee of Marshall D. Doherty. In this assertion they are sustained by the record, for in it is averred "that prior to the taking of said confessed judgment by said bank" (The First National Bank of Crawfordsville, Indiana) "and as a part of the same transaction and as a part of said fraudulent scheme and conspiracy, the said Davidson, as attorney for said Marshall D. Doherty, made out and prepared a deed of assignment purporting to convey to his client, Alexander F. Ramsey, all the goods, chattels and stock

in trade." It necessarily follows that Alexander F. Ramsey was not in fact "an assignee under the voluntary assignment act" of F. Doherty & Son, but of an individual member of that firm, and therefore was very properly made a defendant in this cause, since it was instituted to recover a judgment against the firm and to set aside fraudulent conveyances made by the individual members of the firm.

We need not consider the question of the sufficiency of the complaint further, as counsel for the appellants, in concluding their criticism, say that "The complaint may be good against Mattison Doherty on demurrer."

The second reason stated in the petition for rehearing is, that "There is no allegation that Mattison Doherty has sold, conveyed or converted the property to his own use," and "he is not liable to a personal judgment."

Counsel appeal to "the complaint and the whole record," to support them in this contention.

We take the liberty of quoting briefly from the complaint. It contains, in substance, the following allegations:

First. That Fisher Doherty, Marshall D. Doherty and the firm of Fisher Doherty & Son, composed of said parties, were all insolvent in April, 1889, and that the firm and its individual members (as heretofore stated) then entered into a conspiracy with Mattison Doherty to defraud, by purchase of large amounts of goods on credit, in the name of the firm, and then to convert the goods into cash, and to conceal the money and part of the goods so purchased, and in furtherance of said conspiracy and design aforesaid, the Dohertys and Ramsey sold large amounts of goods, etc., purchased of the plaintiffs, etc., under the fraudulent scheme, whereby they obtained large amounts of money, to wit, $10,000, which they have received and converted to their own use, etc."

We observe that appellants' counsel, near the close of their reply brief, say: "We do not ask the court to hold the complaint bad, because the finding, judgment and whole record show some of the material averments to be untrue. This is not our position. We ask the court to grant us a new trial because the appellees failed to prove some of the most material allegations of their complaint. Allegations, without which, their complaint would be clearly bad on demurrer."

ELLIOTT, J., after an examination of the evidence for this court, concludes his opinion by saying: "The evidence fully supports the finding of the trial court, and the record shows that the merits are entirely with the appellees."

We think the court did not err in the conclusion reached. The evidence fairly shows that Mattison O. Doherty aided in the fraud of the other appellants, and took, secreted and converted to his own use a large amount of money and property that should have been applied to the payment of the debts due the appellees, and if so, he is liable to a personal judgment for the value of the property thus taken, which would aggregate a sum much larger than the judgment rendered against him. The pretense for the transfer of some of the property to Mattison O. Doherty, was that it was in discharge of a preëxisting debt owed by Fisher Doherty & Son to him, but no such claim was ever listed by Mattison for taxation, and there was evidence from which the court could fairly infer that none existed.

The case of *Smith* v. *Freeman*, 71 Ind. 85, was an action to recover damages growing out of a fraudulent combination and conspiracy to cheat and defraud the appellee. The complaint was upheld, declarations of a co-conspirator were admitted in evidence, and judgment rendered against the appellant, who sustained the same

relation in that case that the appellant Mattison O. Doherty does in this, and, on appeal, the judgment was sustained.

In the case of *Everroad* v. *Gabbert,* 83 Ind. 489, the appellee sued the appellants, in the Bartholomew Circuit Court, to recover damages for the conversion of personal property. The jury found for the appellee. The court said: ''The words 'we, the jury, find for the plaintiff,' are equivalent to a finding that the appellee was the owner, and entitled to the immediate possession of the property described in the complaint, and that the appellants * * converted the same to their own use. There is but one finding for the appellee, and but one conversion found. The finding is against all the appellants, and finds them all jointly guilty.'' Again, the court said: ''The appellee insists that under section 41, of the code of 1852, 2 R. S. 1876, p. 51, the complaint in actions for torts is to be regarded as several, and that, therefore, the damages for a tort committed by several jointly may be severed. We think that under the code, as before its adoption, the complaint or declaration in actions for torts is to be regarded as several, and it was for this reason that at common law, though several were sued jointly, some might be found guilty and others not guilty. But it does not follow that under the code, any more than at common law, where two or more are found guilty of a joint wrong, the damages can be severed. * * * The object of the provision obviously is, to prevent a plaintiff who proves a good cause of action against part of the defendants, but not against the others, from being put to delay and expense of a new action. It was not intended to change the law in any other respect; but simply applies to actions upon contract the same rules which at common law were applied to actions of torts. By the rules of the common law, the damages

for a tort committed by two or more jointly could not be severed. The code has not changed the law, in this respect.''

In *Terrell* v. *Butterfield, Exr.*, 92 Ind. 1 (10, 11), the court said: ''The jury might have found from the evidence before them, that both McCarty and Terrell, with full knowledge of the facts, participated in the wrongful conversion of Coburn's money. In such case, the joint conversion of the money by McCarty and Terrell, made them jointly liable therefor to Coburn or his executor.''

The case of *Chamberlin* v. *Jones*, 114 Ind. 458, in many of its features, is the counterpart of this case, so far as it involves the Dohertys. In it the material facts appear to be as follows: ''In July 1884, Parrott & Co. were partners trading as merchants, and owners of a stock of goods worth $1,500. They were indebted to Jones, McKee & Co., for goods sold and delivered, to the amount of $458.76. The debt was evidenced by four promissory notes. Intending to cheat and defraud their creditors, and to prevent the plaintiffs from collecting their debt, the first named partners caused a bill of sale to be made, by which they assumed to transfer their entire stock to the defendant Chamberlin for the nominal consideration of $650, the receipt of which they acknowledged in the written sale bill. It is charged that Chamberlin, participating in their fraudulent purpose, received the bill of sale and took possession of the stock, with the intent to place the goods beyond the reach of legal process, and that he neither paid nor agreed to pay anything for the stock, except that he agreed to account to Parrott & Co. for the surplus over $650. What was to be done with the $650, does not appear from the complaint. It is further charged that Chamberlin, with the co-operation of the other defendants, transferred the goods from the town of Melotte, Fountain county,

the place where Parrott & Co. had previously carried on business, to the city of Lafayette; and that he had concealed and mixed them with his own goods, so that their identity was lost; and that he realized from the sale of the goods so taken and concealed, $500, for which he has never accounted.''

In that case, as in this, upon issues duly made, there was a finding and judgment against all the defendants. Chamberlin appealed, as Mattison O. Doherty here does. The argument on his behalf was predicated on the proposition that the facts stated in the complaint were not sufficient to constitute a cause of action against him; or, if they were, that they did not show a common liability with the other defendants.

The court said : '' The *gravamen* of the complaint against Chamberlin in the present case is, that he entered into a conspiracy with Parrott & Co., to assist them in defrauding their creditors, and that in pursuance thereof he took their goods under cover so as to screen them from legal process; that he converted the goods into money for the purpose of enabling his co-defendants to enjoy the surplus over $650, and that after consummating the scheme he had $500 in money, unaccounted for, in his hands, part of the proceeds of the goods sold and converted.   *   *   *   If he (such conspirator) conceals the property, or converts it into money, or otherwise puts it beyond the reach of legal process, he is guilty of a breach of duty, and a court of equity will compel him to account according to the justice of the case.''

In the case at bar, there was evidence which tends to show that the Dohertys combined to first obtain the appellees' goods, and then to fraudulently dispose of them and put the proceeds thereof beyond the reach of legal process.