**FIRST NAT. BANK OF COLORADO SPRINGS et al. v. McGUIRE**
(two cases).

Nos. 10048, 10049.

United States Court of Appeals
Seventh Circuit.

Oct. 20, 1950.

Arthur L. Gilliom, Elbert R. Gilliom, Albert Ward, Palmer K. Ward, Gilliom, Armstrong & Gilliom, Robert D. Armstrong; and Ward & Ward, all of Indianapolis, Ind., for McGuire.

Warrack Wallace, Joseph J. Daniels, Karl J. Stipher, all of Indianapolis, Ind., David P. Strickler, Thomas M. Burgess, Colorado Springs, Colo. (Baker & Daniels, Indianapolis, Ind., of counsel), for First Nat. Bank.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

KERNER, Circuit Judge.

Plaintiffs, citizens of Colorado, as executors of the estate of Edna M. Frantz, deceased, brought suit in equity to compel defendant to restore money which plaintiffs claimed defendant acquired from Ed-

na M. Frantz through a breach of trust by means of an unfair and unconscionable contract, and by false reports in the estate of Elwood W. McGuire, deceased. The suit also sought to compel defendant to pay to plaintiffs certain income from a trust estate which was due Edna at her death. The case was tried by the court without a jury. The trial judge made special findings of fact, rendered his conclusions thereon, and entered a judgment against defendant for $236,629.67 of which $81,641.74 represented interest. Later, upon motion of defendant to amend the judgment, the District Court eliminated therefrom the interest. To reverse the judgment, defendant appeals, and plaintiffs cross-appeal from the action of the District Court in eliminating the interest.

During his lifetime Elwood W. McGuire was a resident of Richmond, Indiana. His family consisted of Esther, his wife, his son Charles, and two daughters—Mary, who predeceased her parents, and Edna, plaintiffs' testatrix. The foundation of Elwood's fortune was a lawn mower manufacturing business known as Dille & McGuire Manufacturing Co. In 1916 he desired to turn over the active management of this business and of his personal affairs to his son Charles. Accordingly, on March 17, 1916, Elwood and his wife executed a revocable deed of trust to Charles by which a substantial part of the stock of the company was put into what was denominated the "Business Trust," and several parcels of real estate and some investment securities of the approximate value of $800,000 were put into what was denominated the "General Estate Trust." All of the assets of these trusts were turned over to Charles, as trustee, with directions to pay the income to Elwood for his life. Elwood then retired, and with his wife and two daughters moved to Colorado Springs, Colorado. Charles and his family remained at Richmond where he managed the lawn mower business and the trusts. On January 23, 1931, a supplemental trust instrument was executed making the general trust irrevocable. At that time Elwood had two living children, Charles, 56 years old, and Edna, 52 years old. Mary had died some time previously, unmarried and childless.

Under the provisions of the supplemental trust agreement, Charles, the trustee, was directed to pay the net income to Elwood during his lifetime, and upon his death, to Esther during her lifetime. Upon the death of both Elwood and Esther, the trustee was directed to pay the net income to Edna and Charles during their lives, each to receive one-half of the income. Upon the death of Edna, after the death of Elwood and Esther, this trust estate was to terminate and all of the *corpus* was to go to Charles, or if deceased, to his heirs.

In order that his heirs might be relieved of the payment of death taxes accruing at his death, Elwood, in the supplemental trust agreement, reserved the right to have the death taxes and debts of his estate paid with the funds of the general estate trust, and in his last will he again directed that the taxes and debts of his estate be paid with funds of the general trust estate.

Both Esther and Elwood McGuire died at Colorado Springs; Esther, on February 24, 1938, and Elwood, on March 1, 1938. At the time of Elwood's death, Charles was in Florida. When notified of his father's death he went to Richmond and obtained a copy of his father's will, and from there to Colorado Springs. While at Colorado Springs, on the day of the funeral, he discussed with his sister the provisions of his father's will and the requirements of the amendatory trust agreement, and the matter of the payment of his father's debts and taxes. He told her that the estate under the will would be about $600,000, that the taxes might run anywhere from $300,000 to $500,000, and that trust assets would have to be sold to pay them. The Indiana inheritance taxes were not due until a year from the date of Elwood's death, and the federal estate taxes were not due until fifteen months later. After the funeral Charles returned to Richmond and instructed his attorney to draft an instrument to protect him in the use of funds of his father's estate. This agreement, dated March 14, 1938, was sent to Edna, and she signed it and returned it to Charles on March 16,

1938. It stated that the trust estate was invested in securities which could not be sold without loss to the estate, and could not be replaced on the market without loss; that it was agreed that Charles should pay the debts and taxes out of the father's estate instead of out of the trust.

Elwood's will was filed for probate in an Indiana court on May 13, 1938, and Charles qualified as executor. The estate was finally settled on November 16, 1940. Under the provisions of the will $1,000 was specifically bequeathed to Edna, and the residue of the estate was divided equally between Edna and Charles.

The total amount of the residue of Elwood's estate available for distribution to Edna and Charles was $601,311.17—Edna's distributive share amounted to $301,155.59. However, of that sum she received from Charles, as executor, only $157,784.04. On September 25, 1940, Charles sent to Edna for her signature his verified final report as executor of his father's estate. In the report he stated that he had paid Edna the sum of $301,155.59. He clipped together the first five pages of the report and told her to sign on page 5. On one of the pages clipped together he stated "that in accordance with the terms of said will all inheritance taxes and all federal estate taxes have been paid out of the assets of said trust estate and were not charged against the assets of this estate, * * *." But she received only $157,784.04 on account of her distributive share, and Charles, on the death of Edna on July 11, 1941, personally gained the sum of $143,371.55 when he became the sole owner of the corpus of the trust estate.

Contained in the court's findings are these facts:

1. That since March 17, 1916, Charles had handled all the business affairs of the McGuire family and had acted as trustee of the irrevocable trust and as executor of his father's estate; that Edna was not an experienced investor nor a businesswoman, and did not understand the handling of business affairs; that Charles directed her business affairs; that at the time the purported contract of March 14, 1938 was executed, Charles was acting in a fiduciary relationship with Edna, and she relied upon him and did as he told her.

2. That although it appears that Charles discussed the purported contract with Edna, there was no definite proof that anyone explained to her that by that instrument she was giving up the sum of $143,371.55, or that she understood the effect of such a contract.

3. That the purported contract was not to Edna's advantage but only to her loss, and was wholly to the benefit of Charles who became enriched in the sum of $143,371.55 when he became the sole owner of the corpus of the trust estate on the death of Edna.

4. That by virtue of the fiduciary relationship existing between Charles and Edna, her ignorance of business affairs, the loss to her and the advantage and benefit to Charles, the contract was and is unfair, invalid, and of no force and effect, and should not be upheld even though it was signed by Edna.

The court concluded that the entire transaction by which defendant paid the debts and taxes of the McGuire estate was unfair, illegal and void, and constituted a breach of trust by defendant.

In arguing for a reversal, defendant first contends that the findings are not sufficient to avoid the agreement of March 14, 1938. His counsel assert that the action was an action in fraud seeking to set aside an agreement claimed to have been fraudulently induced by defendant, and that the burden was on plaintiffs to prove the fraudulent inducement. They make the point that the court made no finding that the agreement was fraudulently induced, hence the findings that the court did make must be regarded as findings that defendant did not falsely and fraudulently represent to Edna that it would be to her advantage to pay all debts and taxes from the assets of the McGuire estate rather than out of the trust corpus.

True it is, that a party is entitled to be fairly informed by the pleadings of the specific nature of the questions involved in the case, but the rule is well established that the theory of a complaint is

determined by its main and material allegations. Here, plaintiffs by their complaint charged defendant individually and as trustee with having obtained from his sister, without consideration, a large sum of money, while occupying fiduciary relationships with her as an executor of their father's estate and as trustee of their father's trust, in both of which she was a beneficiary, and acting also at the same time as her advisor. In this situation it is clear that the action was one for breach of trust, and there is no merit in defendant's contention. See Cowen v. Adams, 6 Cir., 80 F. 448, affirmed 177 U.S. 471, 20 S.Ct. 668, 44 L.Ed. 851.

The next point raised is that the evidence does not sustain the findings. The argument is that Edna knew the meaning and effect of the agreement; that it was prepared at her suggestion and was freely executed by her.

■ The question of the weight of the evidence was for the trial judge, and we may not disturb his findings unless they cannot be sustained upon any rational view of all the evidence including all reasonable inferences of which the testimony is susceptible; that is, we are authorized to reverse the judgment only if in our view the findings of fact are clearly erroneous.

■ At this point we think it well to mention certain elementary principles applicable to defendant's contention. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546. In Restatement of the Law on Trusts, § 216(2, e) p. 618, it is said: "If the beneficiary consents to a transaction in which the individual interest of the trustee is adverse to that of the beneficiary, the beneficiary is not precluded from setting the transaction aside, or otherwise holding the trustee liable for breach

of trust, where the transaction involves a bargain between them which was not fair and reasonable."

■ A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary. Bruun v. Hanson, 9 Cir., 103 F.2d 685, 699. Here we have an experienced business man who presents a false verified report to a court in an estate in which he is an executor. He makes an agreement with his *cestui que* trust, a woman of no business experience who relied upon him. The agreement defeats the provisions of the will under which she is a beneficiary and thereby he acquires for himself a large part of her property. In this situation there can be no question but that a fiduciary relationship existed between defendant and his sister as a matter of law.

■ It is true that defendant testified that his sister proposed that the taxes be paid with the funds of their father's estate, and that plaintiffs produced no witnesses who were able to deny this conversation. Obviously it could not be denied by his sister. She was deceased. However, the fact that his testimony was not directly contradicted did not require the trial judge to accept his testimony. On the contrary, the court was bound to consider the probability or improbability of his testimony when tested by comparison with the other evidence in the case. Shapiro v. Rubens, 7 Cir., 166 F.2d 659, 666. In our case there was testimony by a maid who had served Edna. She testified that she had observed Charles and Edna talking on the day of the funeral; that Charles talked very loudly, saying, "Edna, you hear what I am saying. You understand what I'm telling you. You do what I tell you, Edna." During this conversation Charles walked back and forth in front of his sister, who was sitting, and she would say, "Yes, Charlie," or "I guess so."

■ In this state of the record the burden of proof was upon defendant to prove that the transaction was fair and reasonable. Cowen v. Adams, 6 Cir., 80 F. 448, affirmed 177 U.S. 471, 20 S.Ct. 668,

44 L.Ed. 851; Ingram v. Lewis, 10 Cir., 37 F.2d 259; Comstock v. Herron, 6 Cir., 55 F. 803; and Teegarden v. Lewis, 145 Ind. 98, 40 N.E. 1047; 44 N.E. 9. And the trial judge was bound to consider all of the circumstances appearing in evidence. This he did. He heard all of the witnesses, formed his judgment as to the credibility of each, resolved whatever conflicts existed, and found that there was no definite proof that anyone had explained to Edna that she was giving up $143,371.50, or that she understood the effect of the contract, and that because of her ignorance of business affairs, the loss to her and the advantage and benefit to Charles, the contract was unfair. We cannot say that Judge Baltzell's findings were clearly erroneous.

Defendant next contends that since plaintiffs' action was commenced in June, 1947, the claim was stale and barred by laches.

The question of laches does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but upon whether, under all the circumstances of the particular case, the plaintiff is chargeable with a want of due diligence in failing to institute proceedings earlier. Townsend v. Vanderwerker, 160 U.S. 171, 16 S.Ct. 258, 40 L.Ed. 383. It is an equitable doctrine and its application is controlled by equitable considerations. It cannot be invoked to defeat justice, and can be applied as a defense only where the enforcement of the asserted right would work injustice. Hoehn v. Crews, 10 Cir., 144 F.2d 665. One who claims the benefit derived from a breach of trust in which he actively participates, and who shows no prejudice resulting from the delay in bringing suit to compel him to account, cannot complain of laches. United States v. Dunn, 268 U.S. 121, 45 S.Ct. 451, 69 L. Ed. 876. These equitable considerations are applicable here.

The record discloses that plaintiffs, citizens of Colorado, were appointed executors of Edna's estate on September 2, 1941. The affairs of the trust and the McGuire estate were administered in Indiana. Defendant's report as executor showed that the taxes had been paid out of the trust as the will provided, and there was nothing in the records of the Indiana court to indicate that the taxes had been paid otherwise. It was not until October, 1942, that plaintiffs discovered that the taxes had been paid contrary to the provisions of the will and trust. They notified defendant of their discovery, but defendant, in the fall of 1943, told them he owed them nothing. At that time one of the executors of Edna's estate was called into military service where he remained until 1946. During his absence, the Probate Court in Colorado would not permit the suit to be filed without the participation of the executor who was in the military service. The complaint was filed shortly after his return. There is no evidence in this record that defendant was prejudiced in any way because of the delay in filing the complaint. Under these facts, it would be inequitable to apply the doctrine of laches.

Defendant also argues that plaintiffs' complaint constitutes an attack on the judgment of a final settlement which the Indiana court, a court of general jurisdiction, rendered in the McGuire estate. He says this may not be done, because an Indiana statute provides a direct proceeding for setting aside such a judgment and fixes a time for bringing such a proceeding.

A quick answer is to say that the action does not constitute a collateral attack on the judgment, Strates v. Dimotsis, 5 Cir., 110 F.2d 374, and Nichols v. Spindler, 222 Ind. 502, 53 N.E.2d 888. This is not a suit to set aside the judgment of final settlement. It is a suit to recover moneys which defendant obtained from his sister at a time when he occupied a fiduciary relationship toward her as trustee of a trust and executor of his father's estate.

As already noted, the trust agreement provided that upon the death of Edna, after the death of the parents, the trust estate was to terminate and all of the property was to go to Charles. In the years 1938, 1939 and 1940, defendant, as trustee, made income distributions to Edna twice

a year. The last distribution was made on December 31, 1940. In the period from January 1, 1941, to July 11, 1941, the date of Edna's death, there matured income on the trust assets which had not been paid to Edna. In his brief defendant states: "Edna only had a right under said trust deeds to have paid to her 'each six months' during her life one-half of the net income 'received' by the trustee from said trust. The trust deeds did not specify which months or parts of months should constitute such six-month periods, but in practice the first six and the last six months of the calendar year were used." The judgment of the District Court includes one-half of this accrued and undistributed income. This, defendant says, is wrong. He contends that all of the accrued and undistributed income, upon the death of Edna, vested in him.

■ We disagree. The law is that in the absence of a contrary intent in a trust agreement, it will be assumed that the trustor intended that income which at the time of the death of a life beneficiary was available for distribution in the hands of the trustee, but which had not been actually paid, is to go to the life beneficiary's estate. This principle is stated in Bogert (1948), Trusts and Trustees, 4, section 816, page 235, and was applied in St. Mary's Hospital of Evansville v. Long, 215 Ind. 1, 17 N.E.2d 833.

In the Long case it was provided that the income should be paid as the beneficiaries and the trustee might agree. The parties agreed upon quarterly payments. One of the beneficiaries, Rebecca Long, received a quarterly payment on March 10, 1934, and then died on May 7, 1934. Her next quarterly payment would have been made on June 10, 1934. The court held that Rebecca's estate was entitled to receive the income collected and on hand prior to her death, and the income maturing but not collected until after her death.

■ Applying the principles just enunciated, we think the District Court correctly held that plaintiffs were entitled to receive the income accumulating in and accruing to the trust from December 31, 1940 to July 11, 1941. In reaching this conclu-

sion we have not overlooked the case of Nading v. Elliott, 137 Ind. 261, 36 N.E. 695. In that case the trustor expressly provided that the unpaid income of the trust should go to the remainderman of the trust. No such provision appears in the McGuire amendatory trust agreement, nor does the agreement contain any provision indicating that Edna or her estate should be deprived of the income.

Finally, defendant contends that the court made no disposition of his counterclaim. He says that he was entitled to recover $12,500 which he paid to his sister, which represents one-half of 100 shares of stock of the Richmond National Bank. We find no merit in this contention.

■ It is true that the judgment does not mention the counterclaim, but the judgment was entered upon the findings of fact and conclusions of law. The court found that there was no evidence supporting the claim of an overpayment to Edna, and concluded that defendant was not entitled to recover from plaintiffs on defendant's counterclaim. This being so, the court necessarily disposed of the counterclaim. Without going into the details of the evidence, it will suffice to say that our examination of the record has convinced us that there was ample evidence to support this finding.

We now consider plaintiffs' cross-appeal. As already observed, the original judgment included interest on the principal amounts due plaintiffs. Later, without changing the findings and conclusions of law, the court struck out all of the interest. This, plaintiffs contend, was error. They argue that in a breach of trust action the *cestui que trustent* is entitled to recover interest from the time of the breach.

■ A wrongdoing trustee should not profit by his wrong, and a wronged *cestui* should be made whole by the wrongdoer. No principle is more settled than that a trustee will not be allowed to profit out of his administration of a trust. Buder v. Fiske, 8 Cir., 174 F.2d 260. We agree with plaintiffs that there is no reason or principle to support a defense by a trustee that he can appropriate a *res* and keep all profits up to the moment the *cestui*

discovers the wrongful act. Any relaxation of these equitable rules would leave every trust at the mercy of a predatory trustee. Here, it is evident from the facts found by the court that defendant is guilty of a flagrant breach of trust, and that Edna and her estate have since 1940 been deprived of money rightfully belonging to her and to her estate. In such a situation, a court of equity must not hesitate in allowing interest. Walker v. Walker's Executor, 9 Wall. 743, 76 U.S. 743, 19 L.Ed. 814. But defendant insists that a demand is necessary before the *cestui* may recover interest. Again we agree with plaintiffs. There is no sound basis for an argument that a *cestui* needs to make demand upon a wrong-doing trustee. The trustee knows what he is doing. He is able to see the consequences of his acts. In a breach of trust action, the plaintiff is entitled to recover interest from the time of the breach, and the cases hold that if fraud is established no demand need be made in order to recover interest. Jones v. United States, 258 U.S. 40, 42 S.Ct. 218, 66 L.Ed. 453, and United States v. Rodiek, 2 Cir., 120 F.2d 760. See also First National Bank v. Rust, 205 Ind. 638, 649, 185 N.E. 127. The Indiana statute, § 19-2003, Burns' I.S. A., 1950 Replacement, provides that interest shall be allowed at the rate of 6% "* * * on money had and received for the use of another and retained without his consent, * * *." We are of the view that interest should have been computed on this basis and allowed as a part of the judgment.

One other matter requires brief notice. The District Court originally allowed interest on $143,371.55 from October 9, 1940, the date when defendant filed his final report as executor. Since it is undisputed that Edna received her half of the interest from the trust to and including December 31, 1940, defendant is entitled to credit for such interest.

The judgment of the District Court is hereby modified so as to require restoration of the allowance of interest on the principal amount due, less a credit for the interest paid to Edna during her lifetime. As so modified, the judgment is affirmed.