### TROYAK v. ENOS.

Nos. 10760, 10761.

United States Court of Appeals
Seventh Circuit.

May 13, 1953.

Rehearing Denied June 4, 1953.

Ashley M. Van Duzer, John S. Beard, Jr., Cleveland, Ohio, Herbert J. Patrick, Indianapolis, Ind., for George E. Enos. McHale, Patrick, Cook & Welch, Indianapolis, Ind., Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, of counsel.

Thomas M. Scanlon, Frederic D. Anderson, Jerry P. Belknap, Indianapolis, Ind., Manly K. Hunt, Chicago, Ill., for Durive Troyak. Turner, Hunt & DeBolt, Chicago, Ill., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiff brought this suit against her mother Ethel, her half-sister Jeanette, her half-brother George E. and the Enos Coal Mining Company, a corporation, to recover from George certain shares of the capital stock of the corporation held by him, on the claim that, as her trustee, agent and fiduciary representative, he had so violated his obligations that certain portions of the stock which he had procured in his individual right should be declared held in trust by him for plaintiff and ordered transferred to her. She sought also to recover the value of some 120 shares of the corporate stock, her conveyance of which to other persons she claimed he had wrongfully

procured in like violation of his fiduciary undertakings.

The cause was referred to a special master, who took the evidence and filed a report including voluminous findings of fact and short conclusions of law. In the latter, he held that plaintiff could not recover for any of the 120 shares last mentioned but was entitled to have delivered to her 250 shares, plus dividends, upon payment by her to George of $25,000. The court approved and confirmed the report and entered judgment accordingly. Cross appeals were perfected. Plaintiff asserts that the trial court erred in denying recovery for the 120 shares and, as to the 250 shares awarded her, that the allowance is insufficient and should be increased. On the other hand defendants insist that there should have been no recovery whatsoever and that the suit should have been dismissed for want of equity.

The 250 shares ordered surrendered by George to plaintiff upon her payment of $25,000 are part and parcel of 1000 shares for which George obtained an option and which he ultimately received from the company. The issue between the parties centers chiefly about these shares, i. e., whether they are trust property or belong to George personally; consequently, in order to dispose of it properly, we have found it necessary to examine somewhat carefully the evidence produced by the respective parties.

Among the master's findings are the following: The Enos Coal Mining Company is an Ohio corporation, mining, selling and distributing coal in Indiana. George A. Enos, husband of defendant Ethel, and father of defendants Jeanette Galbreth and George E. Enos, and step-father of plaintiff, Durive Troyak, Ethel's daughter by a previous marriage, organized and operated the corporation. He undertook to foster and protect the business as a family investment. Ethel, Jeanette and the plaintiff had no substantial business experience. The son George, upon graduating from college and business school, immediately began to work for the company. The father discussed with the son his personal problems and those arising from financing

and operating the company. Jeanette had married at the age of 19, was a housewife and relied upon her brother George in all business matters. Plaintiff had the equivalent of a high school education and operated a small shop with her first husband, McCurdy, for a short time, but had had no executive or administrative experience. She married her second husband, Troyak, in January 1944, and for the next few years, while he was in the army, lived near him.

The corporation had 10,000 shares of capital stock, of which the father originally owned or controlled 5106. Prior to his death in 1940, he transferred 4,716 shares to his wife, retaining only 390 shares. Between 1930 and 1940 he became financially involved, borrowing substantial sums of money and assigning his shares as security therefor. Ethel likewise assigned to the same creditor the shares registered in her name. The net result was that in June, 1940, the Enos family owned stock as follows: the father 390 shares, Ethel 1716, Jeanette, Durive and George, each 1000, all subject, however, to liens in favor of certain creditors. Because of the exigencies confronting him, the father created a voting trust, July 1, 1940, under which all 5106 shares were deposited with the trustees. All the stock was pledged, first to a bank, for a loan it had made and then, to a syndicate of minority stockholders for indebtedness owing it. The senior Enos, having died October 17, 1940, Fred S. McConnell succeeded him as one of the trustees.

At the time the voting trust agreement was executed, the father was in failing health and decided further to create a family trust, the corpus of which consisted of the 4716 shares owned by Ethel, Durive, Jeanette and the son George. The mother and the three children assigned all their voting trust certificates to the son as trustee in the following amounts: Ethel 1716 shares, and each of the three children, 1000 shares. These shares then became trust property, subject to the assignments to creditors. The agreement provided that when the debts were paid and the security released by the creditors, the shares would

become the property of the trust estate, and that the trustee would collect the dividends thereon and pay them "to those * * who are living at the time of the Trustee's receipt of such income". The agreement was to terminate upon the death of all but one of the beneficiaries, and thereupon the trustee was to cause all trust property to be assigned to the surviving beneficiary.

When the father died, his estate was hopelessly insolvent, his assets aggregating about $24,000 and his debts $208,000. As the syndicate still had a first lien upon the 390 shares of the company's stock held by deceased's administrator and upon the 4716 shares held by the trustee, for a substantial debt, it became apparent that some of the stock would have to be sold in order to liquidate the indebtedness. The son, George, on January 21, 1941, obtained from Ethel, Durive and Jeanette a power of attorney, authorizing him to act for them in all matters relating to the settlement of the father's estate and the claims against the same, including full power to perform all and every act requisite and necessary in the premises, including the right to assign or otherwise hypothecate their voting trust certificates.

On June 7, 1941, George, as trustee, negotiated an arrangement with the syndicate, whereby the latter purchased 2430 of the shares held in trust at $60 per share, giving the trustee an option to repurchase them at $100 per share, as a unit, between July 1, 1946 and October 1, 1946. The voting trust of July 1, 1940 was succeeded by a new one for 5500 shares, including the 2430 shares, to continue in existence until October 1, 1946. The 5,500 shares so placed under the control of the new voting trust consisted of the 2430 sold to the syndicate by the family trust, 2071 so-called "free" shares still held by the family trust and 999 shares contributed by various members of the syndicate.

When the 2430 shares were sold, George received the purchase price, $145,800, and used it in settlement of the debts of his father's estate. The family trust then took over the 390 shares owned by the father's administrator at $60 per share and released the estate from any liability. As a result, the corpus of the family trust was depleted by the sale of 2430 shares sold to the syndicate at the price of $60 per share but still retained the option to repurchase them.

The family trust was modified by an instrument dated July 1, 1941, signed by George, Jeanette, and Ethel and by George, as attorney in fact for the plaintiff, and by himself as trustee. The instrument revoked certain provisions previously mentioned, and provided that the trustee should hold the voting trust certificates, exercise such discretion as in his sole judgment he might deem proper for the best interests of the beneficiaries, exercise the voting rights of any security which he might hold from time to time, open a bank account, in the name of himself as trustee, withdraw moneys at such times and for such purposes as he might deem necessary, compromise, compound and adjust claims in favor of or against the trust estate upon such terms and conditions as he might deem best, appoint agents and attorneys, make advances or borrow money, pay taxes, assessments and expenses, obtain approval of the living beneficiaries before he sold any securities, and distribute the income of the trust estate to the beneficiaries. The trust agreement was further modified in January, 1942.

Neither George nor plaintiff was satisfied with the survivorship provisions of the family trust, which precluded possibility of any interest therein in their respective families. They agreed that it was desirable that the beneficiaries save money from the dividends so that when the option period arrived, each would have funds available for use in taking up the options. George represented to his mother and sisters that the options were of substantial value and that they should save as much money as possible, to be invested by him, so that he might increase the savings available for purchase of options. The mother and sisters having agreed, George, as trustee, thereafter received all dividends paid upon the free shares, in the trust, divided the same in four equal parts and paid to each of the beneficiaries out of her respective shares such amount as was required for

her personal needs, and invested the balance. These savings and investments were no part of the trust assets but belonged to the several beneficiaries individually.

George was in the navy from January 11, 1943 until January 1, 1946. During his absence his friend Robert N. Bowen served as trustee and had charge of the individual savings and investments accounts. He did not communicate with the three women about company affairs other than to render accounts but made his reports to George. George wrote to him that "the main thing to keep in the back of your mind is that I am aiming at control of the Company in 1946, * * *. I hope to purchase as near 1000 shares in 1946 for myself as possible * * *."

From 1941 to 1946 the accumulated savings of the three women grew to these amounts: Durive, $29,000; Jeanette, $37,000 and Ethel, $36,000. George informed Durive in 1943 that the stock had excellent earnings prospects and that it might be desirable to buy additional shares; she told him to buy additional stock for her, if he could obtain it at a fair price.

Late in 1945 George wrote plaintiff that in his opinion the trust contained only 2071 shares of free stock and that the option agreement had no connection with the family trust but belonged to him individually. He had previously written her employing in the same connection, the pronouns "we", "our" and "us"; the tenor of these earlier statements was that the options were a part of the trust, and did not belong to him individually. When he returned from the navy, his attorneys advised him that the options were part of the corpus of the trust. Consequently he knew at all times thereafter, if not before that, that the options belonged to the trust and that, as trustee therefor, he was charged with a definite obligation to divide them with the other members of the family, each of whom had an equal right with him therein. He resumed his duties as trustee in January 1946. The trust agreement was still in force; the option agreement still effective and the equitable ownership of all shares and the right to exercise the option still trust prop-

erty. Upon his return he proposed that the company borrow money and buy out stockholders who desired to sell, thus affording the family an opportunity to obtain control. He discussed with his lawyer, his proposal to terminate the trust and distribute the shares and options. The attorney relied upon what George told him, namely, that the options belonged to him, and drew an agreement accordingly. The master found that George's representations to his counsel as to the options were false, as he then well knew; that the misrepresentations were made in order to lead the attorney to draw a contract in accord with them; that the lawyer was misled and deceived by George's false statements and that the final draft, dated January 23, 1946, was based upon this false information supplied by George.

The master found further that at this time George had conceived a scheme whereby he would wrongfully procure for himself 1000 optioned shares belonging to the trust; that, in order to carry out his idea, it became necessary for him to negotiate a loan, without the knowledge of plaintiff, for $100,000 for his own personal benefit, with which he would be enabled to become the sole owner of the 1000 shares to the exclusion of the other beneficiaries; that he knew that, in order to negotiate the loan, the family trust agreement would have to be terminated and the stock deposited as collateral for the loan, and that the loan could not be procured if the other members of the family took their shares of stock elsewhere and deposited them as collateral for outside loans to themselves.

Plaintiff was anxious to buy as much optioned stock as she could finance. George knew that she had $29,000 in her savings account and that she was insisting upon increasing her ownership; but he did not inform plaintiff of his arrangement with the company, and she had no knowledge of it when she signed the modification and learned of it only months later. Eventually the company used $100,000 of its funds to purchase 1000 shares of the optioned stock held by the syndicate, subject to the option to repurchase at $100 per share

and extended the time within which George individually might repurchase the 1000 shares at $100 per share.

The master found that George failed to exert effort to negotiate as trustee for the beneficiaries of the trust; that he made an individual arrangement for his own personal profit out of trust assets, although he was then trustee of the family trust; that he made no reasonable effort to redeem the options for the trust; that he wrongfully failed to exercise good faith and sound discretion to protect the interests of the beneficiaries, although the property belonged to them and was entrusted to him only as their trustee and agent, and that all of these acts on the part of George were without the knowledge of plaintiff.

Plaintiff went to Cleveland on January 21, 1946 and there saw George for the first time since he had returned from the navy. Up to that time she had received no information as to various proposals that had been made or as to George's activities, except merely that it was said to be advisable to terminate the trust and distribute the stock. George told her that business in general was risky and the coal business even riskier and discouraged her from attempting to buy additional stock. She told him decisively that she wanted to stay in the company and keep her stock; he replied that she could have only 290 shares. She said that she thought she could raise the money with which to buy options. He told her that he thought she was mistaken and again discouraged any such attempt.

Ethel informed George that she did not want to take up any of the options. However, she formally assigned her interest in 360, 210 to Durive, 130 to Jeanette and 20 to George. George directed his counsel to prepare a document terminating the family trust and making distribution of its property, and on January 23, each member of the family was given a copy of the instrument. They had not seen it previously, nor had they been advised of its contents. They discussed termination of the trust, the proposal that Jeanette would be paid cash for her shares, and agreed that Durive would have 500 options and Jeanette 500. George told them that he would attempt to handle the options by arranging a deal with the company which would meet the approval of the bank, and that the corporation's attorneys had looked over the agreement and approved it. George did not inform plaintiff that he intended to make the arrangement with the company which we have already mentioned, and she had no knowledge of this plan when she signed the modification agreement.

Following this, in February, the trust's shares and options were distributed as follows: George, as trustee, sold 518 shares to the company for $175 per share, and distributed the proceeds to Jeanette, who wished to sell. He distributed to plaintiff 518 free shares and 440 options and assigned to Mrs. Crawford 60 of plaintiff's 500 options, which he then held for plaintiff, delivering the consideration therefor at $75 per option to plaintiff.

George distributed to Ethel 517 free shares held in trust for her; to himself 518 free shares and the right to take 430 options. The remaining 1000 optioned shares were bought by the company from the syndicate, subject to the option to George to buy the same within 10 years. Three years later, on May 4, 1949, George exercised the option to purchase the 1000 optioned shares which he received on May 25, 1949.

The master concluded that the modification agreement was not binding on plaintiff to the extent of depriving her of her interest in the 1000 optioned shares held in the family trust and that George had used the set-up as an expedient to acquire those shares, to the exclusion of the other beneficiaries; that Durive made no agreement by which she released her rights in the options for the 1000 shares; that upon the dissolution of the family trust, she was entitled to receive a one-fourth interest in the 1000 optioned shares; that she had never received the same; that her receipt given to George did not operate as a release of her right and interest in the 1000 optioned shares, and that no consideration passed to her for a release of her interest in the 1000 shares.

George did not make full and fair disclosure to plaintiff of what he was doing; nor of what he intended doing. He did not tell her and she did not know that he, the company, the bank and the syndicate were all working in close harmony to work out a plan whereby the family trust would be dissolved and the company would use $100,000 of its funds for the purpose of buying the 1000 shares of optioned stock, subject to the option in George, as trustee, and then extend an option for ten years to George in his individual capacity. He did not tell her of his misrepresentations to the attorney or that his true reason for not informing her was that he did not want her to borrow money, as that would have made it impossible for him to raise the $100,000 necessary to have the company buy the stock for him. These and still others, said the master, were material facts which should have been explained, as George well knew that plaintiff had faith and confidence in him, relied upon him and believed he would treat her fairly. He occupied a superior fiduciary and confidential relationship toward her; she had no other advisor or counsellor. George did not efface himself or his own interest but had the benefit of company funds to be used to the extent of $100,000 for his ultimate personal advantage. In the termination of the family trust plaintiff made no agreement and had no understanding as to the disposition of her interest in the 1000 options; she retained her right therein.

The master found that no additional rights accrued or passed to plaintiff by reason of the failure of Ethel to assert her individual rights and that Ethel made no gift to plaintiff of Ethel's interest in the 1000 options beyond those assigned to her; that plaintiff could not be charged with estoppel; that, as soon as she learned the true facts, she consulted attorneys and instituted her suit. He concluded as a matter of law that plaintiff is entitled to recover from George 250 shares of stock, plus the dividends received by him thereon, upon the payment by her to him of $25,000.

 Remembering that it is proper for us to set aside findings of fact only when they are clearly erroneous and accepting the evidence in the light most favorable to the prevailing party, as we must do, after careful examination of the voluminous evidence, we find no justification for holding that the findings of the master, approved by the court, are clearly erroneous. It follows that George E. Enos stands condemned as a violator of his trust obligations and his fiduciary duties; he has so acted with regard to property that he is liable to account for it as a constructive trustee. The courts abhor infidelity in any form; the law condemns it in all its types, and affords various remedies for its discovery and correction. It matters little which of her various robes equity dons in her role as a righter of wrongs, so long as her conduct is becoming to one who, in her innate character, embodies fairness, fidelity and honesty. Consequently we are but slightly concerned with whether the delinquent trustee should be charged with violation of express trustee duties or with having made himself liable as constructive trustee or both, so long as the remedy supplied accords with equity. His violation of the terms of the written trust are clear. It seems equally clear that he should be treated as a constructive trustee of property because of his diversion of it to himself, subsequent to his wrongful procurement of cancellation of the express trust.

 Where a beneficiary enters into a transaction with his fiduciary relating to matters within the scope of the fiduciary relationship, the transaction is voidable unless it is fair and reasonable and assented to by the beneficiary with knowledge of his legal rights and of all relevant facts that the fiduciary knows or should know. 2 Restatement, Contracts, Section 498. First Nat. Bank of Colorado Springs v. McGuire, 7 Cir., 184 F.2d 620, 625–626; Rochester v. Levering, 104 Ind. 562, 568–569, 4 N.E. 203; 40 Ohio Jur. 301, Sec. 110; Globe Woolen Co. v. Utica Gas & E. Co., 1918, 224 N.Y. 483, 121 N.E. 378; Ball v. Hopkins, 1929, 268 Mass. 260, 167 N.E. 338. Where one party is under the domination of another, or by virtue of the relation between them is justified

in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is voidable. 2 Restatement of Contracts, Section 497. The Indiana law is to the same effect. Thus in Whitesell v. Strickler, 167 Ind. 602, 78 N.E. 845, 848, the court said: "* * * in all cases where the relations in life are such that influence is acquired by one and confidence reposed by another, so as to give rise to opportunity for imposition or undue influence, such as arise between guardian and ward, parent and child, husband and wife, principal and agent, and the like, and where one of the parties, by reason of his surroundings, is unable to treat with the other upon terms of equality, courts of equity will carefully scrutinize the dealings between them and compel restoration in the absence of absolute fairness. 'In such cases,' says Judge Story, 'the one subject to undue influence has no free will, he is *in vinculis,* and the constant rule in equity is that where a party is not a free agent, and is not equal to protect himself, the court will protect him.' 1 Story's Equity [13th ed.], § 239. * * *"

In such situations, when necessary to achieve equity, the court will impose upon the fraudulent fiduciary a constructive trust. 3 (Pt. 1) Bogert, Trusts and Trustees, Sec. 481, p. 79, and Section 471, p. 5. The author comments: "Obviously this constructive trust is not the product of the intent of the parties. It is not enforced because the parties expressed a desire to have a trust and performed the necessary conveyancing acts. It is merely a tool of the court to work out an equitable result in the simplest fashion. It is created regardless of the intent of the parties, and naturally directed against the intent of the defendant." The Indiana court also said, in Westphal v. Heckman, 185 Ind. 88, 97, 113 N.E. 299, 302, "such a trust will be constructed by the court as will subserve the ends of justice and fair dealing." In framing its decree the court is not bound by technical limitations. It is not limited to confirming or upsetting in its entirety the transaction said to be tainted. Veazie v. Williams, 1850, 8 How. 134, 160–161, 12 L.Ed. 1018, 1029; Bettendorf v. Bettendorf, 1920, 190 Iowa 83, 179 N.W. 444, 462–463; Mills v. Morris, 1914, 156 Wis. 38, 145 N.W. 369, 371; Paquin v. Milliken, 1901, 163 Mo. 79, 63 S.W. 417, 424–426; Walker v. Swasey, 1861, 84 Allen (Mass.) 312, 315–316; Coffinberry v. Sun Oil Co., 1903, 68 Ohio St. 488, 67 N.E. 1069. It is clear then that the trial court was fully justified in entering judgment fashioned as this one because not only did the wrong committed violate the terms of an express trust, but also because the inequitable conduct complained of was such as to justify creation and enforcement of a constructive trust. There remains to be disposed of the question of whether the relief granted was adequate.

The option to repurchase shares was a valuable part of the corpus of the trust estate, for the evidence indicates that, though it granted the right to rebuy at $100 per share, each share, at the time of distribution, had a value perhaps of $200 so that the option to buy one share was worth $100, and to buy 1000 shares $100,000. This trust asset George E. diverted to his own use, whereas, as fiduciary, he should have seen that it was properly distributed to all the beneficiaries. The court concluded, therefore, that 250 should go to plaintiff. The question presented in this respect, then, is whether this was a proper allocation to plaintiff.

Included in the corpus of the trust estate were 2071 "free" shares of company stock and 2430 under option, all of which belonged equally to the beneficiaries. But when the trust was terminated, though the free shares were divided equally, the 2430 options were divided differently. As equal beneficiaries, the mother and each of the three children was entitled to 607½ options. The mother gave plaintiff 210; Jeanette 130 and George 20. She indicated clearly, in her testimony, that it was her intent that George receive the benefit of the rest of her interest in the options, which amounted, after deduction of the 360 shares she had given away, to 247½. Plaintiff originally claimed that Ethel abandoned these latter options and that each of the three children was entitled to one-

third thereof. However, she has specifically waived this contention and we must accept as a fact on the face of the record that it was Ethel's intent that George should have the 247½. Consequently, on proper division of the 2430 optioned shares, it seems clear that George was entitled to 607½, his original share, plus 267½ as formal and informal assignee of Ethel, or a total of 875; that plaintiff was entitled to 607½, plus 210 given her by Ethel, or a total of 817½; that she received in fact only 500, and that, therefore, George has diverted from her 317½ options which should be surrendered to her. Jeanette had 607½ options as her original interest and 130 given her by Ethel, or a total of 737½. Consequently, the proper portions of each of these beneficiaries was: George 875, plaintiff 817½, Jeanette 737½, making a total of 2430.

Inasmuch as plaintiff is entitled to 817½ and has received only 500, there remain due her 317½ instead of 250, which the court directed be surrendered to her. The judgment must, therefore, be modified to provide for the delivery of 317½ of the options now converted into shares, which George received as part and parcel of the 1000 options diverted by him from the trust estate, plus the dividends collected thereon, upon payment of $31,750.

Plaintiff seeks to recover likewise 60 options for shares purchased by George late in 1943 through a broker for his wife, Nancy, at 105 per share. George knew at that time that plaintiff desired to purchase additional shares and failed to inform her of the opportunity to acquire this lot of 60. However, he wrote her that he had bought the stock for Nancy. The master found that the 60 shares had not been entrusted to him by the beneficiaries; that they were no part of the trust assets; that George had not undertaken any obligation to purchase such shares for the beneficiaries; that he did not act for the latter in making the purchase and that the shares were paid for by the funds of himself and his wife and not by trust funds. He concluded that George did not breach the good faith and sound discretion required of him as trustee and fiduciary in the purchase of the 60 shares of optioned stock. Again indulging the rule that we must view the evidence in its light most favorable to the prevailing party, we are not justified in holding that the findings in this respect are clearly erroneous.

Plaintiff seeks to recover also 60 shares of optioned stock assigned by her to one Mrs. Crawford in January, 1946. Upon this issue the master found that this sale was the result of an oral agreement between plaintiff and George wholly separate from the transaction concerning the 1000 shares; that, in a discussion between plaintiff and George, though she objected to the proposed sale, largely because she was averse to selling to Mrs. Crawford, she made it clear that she wanted some $5000 for personal family expenses and finally consented to the sale of 60 shares at $75 per share, which was at the time, the master found, their fair market value. He found also that plaintiff knew that she was parting with title to and possession of the 60 shares and knew what she was getting therefor; that George derived no personal ownership or interest in the 60 shares, and that whatever influence the transaction may have had in preventing plaintiff from borrowing the money from sources outside the family for her personal use was too remote to entitle her to recover. After examining the record we conclude again that there is adequate testimony to support the findings and conclusions in this respect and that they are not clearly erroneous.

Defendants complain of the reference to a master. They rely upon 28 U.S.C.A. Rule 53(b): "A reference to a master shall be the exception and not the rule. * * * in actions to be tried without a jury, save in matters of account, a reference shall be made only upon a showing that some exceptional condition requires it." Under this rule, the court may refer any accounting, and is endowed with a discretion as to whether a reference should be made because of a showing that "some exceptional condition requires it." It should be observed in the first place, that this is an action against a trustee for an

accounting of his trust administration, for certain property and for relief from his breach of fiduciary obligations. The trial court may have well believed that a reference was justified because the suit involved an accounting by a trustee. Furthermore, it may well have believed likewise that exceptional circumstances required a reference. Some of the witnesses were available in Indianapolis, some in Cleveland, some in Florida. Where the issues of fact are closely drawn, it is desirable that the finder of the facts, see and hear the witnesses in person rather than by transcribed deposition. Hearings were held in Cleveland and those in Florida were avoided, because it became possible to arrange that the witnesses residing there come to Indianapolis. The case was broad and complex. Three hundred exhibits were offered in evidence and hearing of parol evidence required some six days. The circumstances of the court, itself, were unusual. Judge Baltzell had retired. He was sitting as a retired judge under assignment, as provided by the federal statute. He called the attention of the parties to the situation, saying that he did not expect to try cases, that he was merely sitting by assignment, until his successor should be appointed. In this situation it would apparently have been impossible or inadvisable for him to try the case. At any rate, under all the circumstances related, we think there was no abuse upon his part in exercising his discretion by making a reference, not according to the general rule but as an exception thereto.

▮ The master denied the defenses of estoppel and ratification. He went into some detail as to the facts bearing upon these defenses. Defendants have renewed their argument in this court, asserting that plaintiff is estopped to attack George's conduct because she later got from her mother Ethel an option to buy the latter's free shares upon the mother's death, at the then book value of such shares. It is apparent that this outside option from her mother for shares of stock owned by the latter individually was in no way related to the alleged misconduct of George in procuring for himself the benefit of 1000 options at one-half or less of the then value. It is clear from the record that at the time she procured this option from her mother, she was unaware of what George had done in order to effectuate a diversion of 1000 options, then and there a part of the corpus of the trust estate, to himself. The evidence adequately supports the master's findings in this respect and we can discover no basis in the record upon which we could declare them clearly erroneous.

The judgment will be modified as indicated. In all other respects it is affirmed. Defendants will pay two-thirds of the costs of this appeal and plaintiff one-third.